**Application of Elis Erik Wilhelm HELIN.**
**Patent Appeal No. 6844.**

United States Court of Customs
and Patent Appeals.

Nov. 14, 1962.

Rehearing Denied Feb. 13, 1963.

———◆———

Cameron, Kerkam & Sutton, Gordon W. Daisley, William B. Kerkam, Jr., Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (S. Wm. Cochran, Washington, D. C., of

counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges, and Judge JOSEPH R. JACKSON, Retired.

MARTIN, Judge.

This is an appeal from a decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 1, 2 and 3 of appellant's application Serial No. 460,235, filed October 4, 1954, for METHODS OF PRODUCING LOW-CARBON CHROMIUM ALLOYS. No claim was allowed.

Claim 3, illustrative of the appealed claims, reads:

"3. The method of producing a low carbon chromium alloy which comprises the steps of subdividing a ferrochromium containing 2 to 8% of carbon, 40 to 75% of chromium, and from 3 to 10% of silicon in the liquid state unter oxidizing conditions, whereby a powder of partially oxidized metallic particles is obtained, and decarburizing said powder by heating the same at temperatures not exceeding 1300° C in a substantially oxygen-free atmosphere the carbon monoxide pressure of which is maintained at a level not exceeding the equilibrium pressure of the carbon monoxide at the temperature used."

Appellant's application describes an improved method for the decarburizing of a high carbon chromium alloy such as ferrochromium. The alloy undergoing treatment is subjected to two steps: (1) molten alloy is subdivided by a gaseous blast which reacts with the particles of alloy to form an oxide coating thereon, and (2) the particles are heated to a temperature not exceeding 1300° C. to react the oxide layer with the carbon in the alloy. The heating step is conducted in a substantially oxygen-free atmosphere, the carbon monoxide pressure of which is maintained at a level not exceeding the equilibrium pressure of the carbon monoxide at the heating temperature.

The references relied on are:

Rennerfelt 2,170,158 August 22, 1939 "Stahl und Eisen," September 9, 1948 issue, article by Naeser et al., pages 346 to 353.

The Rennerfelt patent describes a method of decarburizing a carbon holding metal, for instance, pig iron which is an iron carbon alloy. Rennerfelt's method involves first subdividing the carbon holding metal such as white or gray pig iron into more or less hollow granules, grains, a fine powder or thin flakes by means of mechanical crushing and grinding or by exposing the iron when in a liquid state to the action of water, air or steam. The finely subdivided iron is then exposed to the action of solid or gaseous oxidants at a temperature between 750° and 1100° C. or thereabout.

The article in "Stahl und Eisen" discloses a method for the production of iron powder which comprises atomizing a liquid iron carbon alloy as by compressed air or the like, with a controlled partial oxidation. The alloy particles, coated with an oxide, are then subjected to a refining annealing operation at 950° C. In the annealing, the carbon, and therefore also the oxygen are eliminated to a large extent and the resulting carbon monoxide-carbon dioxide mixture is used as protective gas.

The examiner stated that Rennerfelt discloses that his method for decarburizing cast iron may be employed for decarburizing ferrochromium and ferromanganese. It was the examiner's position that, in view of Rennerfelt's disclosure that his method of decarburizing cast iron by comminuting it and heating it in the presence of oxides may be applied to ferroalloys, it would be within the skill of the art to try the method of oxidizing and decarburizing the iron of "Stahl und Eisen" on ferroalloys.

In sustaining the examiner's rejection of the claims, the board held that the Rennerfelt patent clearly suggests to one

skilled in the art that the method in "Stahl und Eisen" could be used to decarburize ferrochromium alloys. That, it alleged, was so because the Rennerfelt method is of the same general type as the "Stahl und Eisen" procedure. The board considered that the extension of the method in "Stahl und Eisen" therefore, to another alloy merely amounts to following the teachings of the prior art.

Our task is to decide whether one with ordinary skill in the art at the time of appellant's invention and with knowledge of the cited references, would consider the method of decarburizing the carbon iron alloy used in the method outlined in the "Stahl und Eisen" article to be applicable to ferrochromium. We think that he would.

Appellant urges that the method in the Rennerfelt patent clearly has nothing to do with the method of the present invention. We realize that the method of Rennerfelt is not entirely similar to that recited in the appealed claims. That does not appear to be denied by the examiner or the board. However, on comparing disclosures in appellant's application and the Rennerfelt patent it appears that appellant's first step, that is, subdividing the higher carbon chromium alloy in the liquid state under oxidizing conditions, corresponds to Rennerfelt's first step. In his application appellant states:

"The subdivision of the molten chromium alloy forming the first step of the method according to the invention can be carried out by means of known apparatus in which a jet of molten metal escaping through a nozzle provided in the bottom of a suitable container is subjected to the action of a powerful blast ejected through an annular nozzle disposed concentrically to the liquid metal nozzle. For the purposes of the invention, the blast should consist of a gaseous fluid of such composition as to effect the required oxidization of the molten chromium alloy, for instance compressed air or steam or an air-steam-mixture. * * *"

The Rennerfelt patent describes the subdividing of the metal undergoing treatment as follows:

"The several objects of my invention are attained by first subdividing the carbon holding metal such at white or gray pig iron into * * * a fine powder * * * by exposing the iron when in a liquid state to the action of water, air or steam. This may be done by * * * blowing air or steam onto a jet of iron flowing from a furnace or a ladle."

It is true that Rennerfelt's second step of introducing a solid or gaseous oxidant into his system is distinct from appellant's second step, albeit appellant's second step appears to have been broadly considered in the prior art as appears evident from the introductory portion of appellant's application. Therein, in discussing various methods that have been proposed for producing low carbon ferrochromium by subjecting ordinary high carbon ferrochromium to a decarburizing treatment, appellant states:

"* * * According to one method, high carbon ferrochromium is ground into a powder; the powder is heated in air to obtain a partial oxidization; the resulting powder together with a suitable binder is formed into small balls or pellets; and the balls or pellets are heat treated in vacuum to a temperature below the melting point of the oxide coating of the particles, so that the particles are decarburized by reaction between the oxygen of the oxide coating and the carbon."

In that method, as in appellant's method, there is a decarburization of the ferrochromium particles by reaction between the oxygen of the oxide coating and the carbon in the alloy.

What is more important, in Rennerfelt there is the suggestion that the patentee decarburizes both ferrochromium and pig iron, by substantially equivalent methods. Appellant argues that Rennerfelt gives the impression that he was not very sure of the possibility of decarburizing ferro-

chromium in the solid state by means of a solid oxidant. We do not think there is anything indefinite about Rennerfelt's disclosure that his process can be used to decarburize ferrochromium. In elaborating on the process, Rennerfelt states:

"When required for certain reasons, for instance for decarbonizing FeCr or FeMn, etc., one may introduce hydrogen gas or steam into the charge and one may also cause it to be heated in vacuo, preferably in a high frequency furnace in order to facilitate the splitting up of for instance a carbide of Cr or Mn, which are much more stable than the cementite of iron. * * * "

Another pertinent portion of the patent reads:

"When using the method for decarbonizing other metals than pig iron it may be advisable to use other solid oxydants [oxidants] than stated in the case of iron. One might also find it useful to increase the temperature considerably in the case of decarbonizing FeCr and FeMn."

In our opinion those recitations in the Rennerfelt patent clearly suggest that ferrochromium, as well as pig iron, may be decarburized by substantially the same method.

In his brief, appellant infers that he creates a chromium oxide coating on the ferrochromium particles which chromium oxide is wholly or partly used as his decarburizing agent. Appellant accordingly urges that Rennerfelt nowhere suggests the use of a decarburizing agent consisting wholly or partly of chromium oxide. We, however, are unable to find in appellant's application any statement that the decarburizing agent consists wholly or partly of chromium oxide and the claims obviously are not limited in that respect. Therefore that line of reasoning seems illogical.

Appellant urges that where high carbon pig iron and ferrochromium had before been decarburized by distinct methods, there can be no reason why the method of "Stahl und Eisen" for high carbon pig iron should suggest an attempt to decarburize ferrochromium by a like method. Although we do not deny, as pointed out above, that Rennerfelt's second step of introducing a solid or gaseous oxidant into his system is distinct from appellant's second step, we do not agree that that would prevent one from attempting the method in the "Stahl und Eisen" article on ferrochromium. The Rennerfelt patent clearly suggests that a method similar to one for decarburizing pig iron can also be used to decarburize ferrochromium. Furthermore, "Stahl und Eisen" separates carbon from an iron composition. Appellant is also interested in separating carbon from an iron composition.

Finally the steps of appellant's method are substantially the same as the steps disclosed in the "Stahl und Eisen" method. With the above facts in mind, we consider it to be within the ordinary skill of one in the art to apply the "Stahl und Eisen" method to the decarburization of ferrochromium.

Appellant urges that the board's rejection begs the issue, pointing out that it should not be assumed that anyone would do anything without sufficient inducement to do so. The solicitor, on the other hand in his brief, has aptly pointed to several prospective advantages which would be suggested by the disclosure in "Stahl und Eisen," and which would motivate one to try the method in "Stahl und Eisen" for decarburizing ferrochromium. Those are:

"(1) Comminution of molten FeCr by a jet would, *' * * avoid an expensive grinding operation.

"(2) Combining the oxidation with the comminution, as suggested in 'Stahl und Eisen,' saves the time and expense of an extra oxidation step, as was necessary in the earlier process.

"(3) It is possible, according to the 'Stahl und Eisen' article, to control accurately the extent of the oxidation in the combined comminuting and oxidizing step to envelop the

grains with the exact amount of oxygen required. * * *"

We agree that those prospective advantages are a sufficient motivation for one to try the method in "Stahl und Eisen" on ferrochromium.

We conclude that the rejection of claim 3 should be affirmed.

For substantially the same reasons, we think that claims 1 and 2 were properly rejected. Those claims broadly recite subdividing a higher-carbon chromium alloy. That recitation obviously includes the ferrochromium of claim 3. It is thus apparent that claims 1 and 2 must fall with claim 3.

The decision of the board is affirmed.

Affirmed.

SMITH, J., concurs in result only.